1
2
3
4
5
6
7
8
9                          UNITED STATES DISTRICT COURT

10                        NORTHERN DISTRICT OF CALIFORNIA

11                               SAN JOSE DIVISION

12    COLUMBIA CASUALTY CO.,              )    Case No.: 09-CV-05441-LHK
      an Illinois company,               )
13                                        )    FINDINGS OF FACT AND
                            Plaintiff,    )    CONCLUSIONS OF LAW
14                                        )
              v.                          )
15                                        )
      GORDON TRUCKING CO., et al.,        )
16                                        )
                           Defendants.    )
17    _____)

18           This case centers on a dispute between insurers over a $5 million contribution to a

19    settlement to an underlying action (the "Bianchi Action") for catastrophic injuries from a car

20    accident.  Plaintiff Columbia Casualty Insurance Company ("Columbia") seeks a declaration that it

21    does not have to pay the $5 million because Columbia's insured, Defendant Gordon Trucking,

22    litigated and agreed to settle the Bianchi Action without informing Columbia of the litigation's

23    progress or the settlement in breach of a "no voluntary payments" (NVP) provision in the policy.

24    The remaining Defendants are the insured Gordon Trucking, and American International Specialty

25    Lines Insurance Company ("AISLIC"), a co-excess insurer along with Columbia.  AISLIC

26    contributed a total of $13 million to the Bianchi settlement, $5 million of which it alleges is

27    Columbia Casualty's responsibility.   AISLIC's position is that Columbia cannot rely on the NVP

28    provision to avoid payment because Columbia was not actually prejudiced by the settlement and

                                            1

because Columbia breached its duty to conduct a meaningful investigation of the underlying liability claim.

The Court held a bench trial in this matter from June 20 to June 24, 2011.  Columbia's witnesses at trial were Guy Calladine (video deposition) and Edith Matthai, an expert witness on the issues of claims handling procedures and chances of success on appeal.  Gordon Trucking and AISLIC's witnesses at trial were James Hoefer, Jerome Falk, and Edward McKinnon.  The parties also stipulated to admission of a substantial number of deposition excerpts and counter-designation excerpts.  Finally, the parties stipulated to over 200 exhibits submitted into evidence.  Below, references to "Dep." and "Counter-Dep." are to admitted deposition and counter-deposition excerpts, and references to "Exh." are to admitted trial exhibits in the case.

Based on the trial and the full record in this matter, the Court issues the following findings of fact and conclusions of law.

## I.   FINDINGS OF FACT

Based on the evidence presented to this Court at the June 2011 bench trial, the Court makes the following findings of fact.

Unless otherwise noted, the following facts are established by stipulation of the parties. [1] Findings of fact not established by stipulation of the parties begin with ** symbols.

1.   Gordon Trucking is a Washington corporation with its principal place of business in Washington.

2.   AISLIC is an Illinois corporation with its principal place of business in New York.

3.    Columbia is an Illinois corporation with its principal place of business in Illinois.

4.   On May 3, 2007, Drew Bianchi ("Bianchi") suffered catastrophic brain injury in an automobile accident that occurred on Highway 152 in California.

5.   A Salazar Equipment Company ("Salazar") truck driven by Samuel Bimbela ("Bimbela") crossed the center line of the highway, hit a Gordon Trucking truck driven

---

[1] The parties originally stipulated to 81 "Undisputed Facts" in their May 25, 2011 Joint Pretrial Statement.  *See* Dkt. #91.  However, in a June 15, 2011 joint stipulation, the parties withdrew "Undisputed Fact No. 49."  *See* Dkt. #108.

Case No.: 09-CV-05441-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

by Michael Demma ("Demma") traveling in the opposite direction, and then struck an automobile in which Bianchi was a passenger (the "accident").

6.   On January 28, 2008, Bianchi filed a lawsuit for negligence arising out of the accident in the Santa Clara Superior Court, Case No. 1-08-CV-104548 (the "Bianchi action"), naming Salazar, Bimbela, Gordon Trucking, Demma, and the State of California as defendants.

7.   The parties to the Bianchi action initiated and responded to discovery in that action shortly after it was commenced.

8.   Gordon Trucking had several layers of insurance coverage for the claim asserted by Bianchi in the Bianchi lawsuit.

9.   Gordon Trucking's primary coverage was a $5 million policy with Great West Casualty Company ("Great West") that included a $500,000 self-insured retention by Gordon Trucking (the "Great West policy").

10.  Columbia, a CNA company, issued an excess $5 million policy, No. L 2090826851, that was the first excess layer of insurance above the Great West policy (the "Columbia policy").

11.  AISLIC issued an excess $20 million policy, No. 8854971, that was excess to the Great West and Columbia policies (the "AISLIC policy").

12.  Fireman's Fund Insurance Company ("Fireman's Fund") issued a $20 million policy that was excess to the Great West, Columbia and AISLIC policies.

13.  On August 5, 2008, Gordon Trucking tendered the claim asserted by Bianchi in the Bianchi action to Columbia, AISLIC and Fireman's Fund (the "tender letter").  The tender letter was signed by Theresa Pruett, Gordon Trucking's General Counsel ("Pruett").  *See* Exh. 19, Letter dated August 5, 2008 from Theresa Pruett to Columbia Casualty, AIG Domestic Claims and National Surety Corporation with attachment, Bates No. CNA 01228-1255.

Case No.: 09-CV-05441-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
For the Northern District of California

14.   The tender letter informed Columbia, AISLIC and Fireman's Fund that based on initial discovery, Bianchi's injuries appeared to be severe.

15.   The tender letter provided the name and contact information for Gordon Trucking's outside counsel, Richard Alley ("Alley"), and Great West's adjustor, Edward Dildine, who were handling the Bianchi claim.

16.   The tender letter stated that it contained "a brief summary of events surrounding the loss" and was "not intended to address the issues of liability and damages under the specific facts of this loss."  The tender letter said that under separate cover, Gordon Trucking's outside counsel would "provide a more detailed description and assessment for review."  The tender letter also advised that if the insurers needed additional information, they could contact Pruett at her direct telephone number or email address.

17.   Neither Alley nor any other attorney for Gordon Trucking sent to Columbia a "more detailed description and assessment for review."

18.   The tender letter enclosed a copy of a Collision Report from the California Highway Patrol regarding the accident (the "CHP report").  The CHP report stated that Bianchi had suffered "internal trauma to head and chest."  *See* Exh. 19 at CNA 01236.

19.   The CHP report included a statement from a Captain McMillon, who had been driving a fire truck that was directly in front of the Gordon Trucking truck.  The CHP report included captain McMillon's statements that he saw the Salazar truck approaching, saw that it had drifted into the fire truck's lane by about a foot, swerved sharply to avoid being hit, and from his rear view mirror, saw the Salazar truck hit the side of the Gordon Trucking truck.

20.   The CHP report concluded that the cause of the accident was the Salazar truck crossing the double-yellow center line.

21.   On August 14, 2008, James Hoefer ("Hoefer"), an employee of Continental Casualty Company, another CNA company, sent a letter to Pruett in response to the tender letter

4

United States District Court
For the Northern District of California

(the "Columbia response letter").  *See* Exh. 21, Letter dated August 14, 2011 from James Hoefer to Theresa Pruett, Bates No. CNA 001932.

22. Hoefer asserts that he was acting in his capacity as "gatekeeper" for unsupported excess claims when he sent the Columbia response letter.  In that capacity, Hoefer decides whether to treat claims submitted to CNA insurers as "Record Only," or whether instead those claims should be sent to a claims consultant at CNA for monitoring.

23. An "unsupported excess claim" is a claim in which the CNA company has issued an excess insurance policy, and the primary insurance has been issued by a company other than a CNA company.

24. A decision to treat a claim as "Record Only" means that there would be no reserve amount set, and the claim would be closed down, subject to being re-opened if additional information was provided in the future.

25. Hoefer spent approximately 30 minutes reviewing the tender letter, the CHP report and possibly the declarations page of the Columbia policy before sending the Columbia response letter.  He did not review any other documents.[2]  Nor did he consult or otherwise communicate with anyone about the tender letter, the CHP report or the Columbia response letter prior to sending the Columbia response letter.  Hoefer was not required to get any approval from anyone at CNA prior to sending the Columbia response letter.

26. Hoefer asserts that CNA's internal claims handling guidelines did not apply to his work as "gatekeeper," and that there were no CNA guidelines governing that work.  Nor did anyone at CNA supervise or direct Hoefer's work as a "gatekeeper."

27. The Columbia response letter was a form letter that Hoefer had created that he used to respond to tenders of claims that he received.

---

[2] Although the parties stipulated to this fact prior to trial, at trial, Hoefer testified that he also recalled reviewing the complaint in the Bianchi action.  *See* Transcript of Bench Trial ("Tr."), Vol. 1 at 57:1-3 ("My recollection is that there was a summons and a complaint, or at least a complaint that was also attached.").

5

28.    The Columbia response letter included the following statements: "CNA has determined that the nature of the incident alleged by the Claimant is unlikely to impact CNA's policy limits should a formal claim or suit be pursued and the matter will be designated 'Record Only.'  If you, your insurance broker and/or the underlying insurance carrier(s) subsequently obtain any information which indicates that the Claimant's injuries may impact CNA's excess policy limits and/or if the underlying insurance carrier(s) disclaims coverage for this claim or their limits of coverage become eroded or exhausted, please so notify the undersigned immediately."

29.    The Columbia response letter contained several errors.  It misstated the identity of the CNA company that had issued the policy to Gordon Trucking, it mistakenly said that the tender letter had come from Gordon Trucking's insurance broker, and it stated that the Bianchi claim was "unlikely to impact CNA's excess policy limits should a formal claim or suit be pursued" when in fact the tender letter had stated that Bianchi had already filed suit.

30.    Hoefer never asked to see any of the discovery that had been propounded or answered in the Bianchi action.  Nor did he ask for Bianchi's medical records, or make any effort to determine the severity of Bianchi's injuries; the cost of past, present or future medical treatment or care; Bianchi's potential lost earning capacity; or Bianchi's prognosis for recovery.  When he sent the Columbia response letter, Hoefer knew nothing about what the cost would be to compensate Bianchi for his injuries if he were successful at trial.

31.    Hoefer would not have designated the claim as "Record Only" if he had information that Bianchi was on life support.

32.    Medical records in existence prior to Hoefer sending the Columbia response letter on August 14, 2008, revealed that Bianchi had suffered catastrophic injuries during the accident, and that following the accident Bianchi had "no significant neurologic response other than occasional gasping respiratory movements."

33.   Hoefer did not seek any further information after sending the Columbia response letter. Nothing prevented or precluded Hoefer from attempting to determine the severity of Bianchi's injuries or otherwise investigating the Bianchi claim, either before or after he sent the Columbia response letter.

34.   Hoefer was aware when he sent the Columbia response letter that under California law, Gordon Trucking would be jointly and severally liable for all of Bianchi's economic damages even if Gordon Trucking was found only 1% at fault. When he sent the Columbia response letter, Hoefer believed that there was a 5-10% chance that Gordon Trucking could be found liable.

35.   Hoefer understood when he sent the Columbia response letter that a settlement that did not invade Columbia's limits did not require Columbia's consent.

36.   Pruett sent Columbia a second copy of the tender letter and CHP report on or about September 2, 2008, and also left Hoefer a telephone message at about that time, asking him to call her. Neither Hoefer nor Columbia responded to the second copy of the tender letter and the CHP report.

37.   **Even if he had received information that Bianchi's injuries were "very serious," Hoefer would not have changed his position to designate the claim as "Record Only." *See* Tr., Vol. 1 at 90:1-19.

38.   **During his time as "gatekeeper" for unsupported excess claims for CNA, Hoefer has never contacted a representative of a primary insurer to find out additional information. *See* Tr., Vol. 1 at 79: 12-15.

39.   On August 22, 2008, Jenna Marzorati ("Marzorati") of AISLIC sent a letter to Gordon Trucking in response to the tender letter, stating that it was AISLIC's opinion that the Bianchi claim did not present an exposure to the AISLIC policy and notifying Gordon Trucking that AISLIC was closing its file. AISLIC's letter further stated that if Gordon Trucking became aware of a change in status in one or more of certain areas, then

Case No.: 09-CV-05441-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

Gordon Trucking should immediately notify AISLIC so that it could reconsider the need to actively monitor further developments.

40. The August 22, 2008 letter was not drafted by Marzorati, but was instead drafted by her assistant.  Marzorati does not know who at AIG domestic claims determined the content of the letter, which was a standard form letter.  Marzorati's manager directed the assistant to send out the letter after he discussed the claim with Marzorati.  Marzorati does not remember if she reviewed the AISLIC policy, and believed at the time that AISLIC had a $20 million excess layer on top of a $5 million primary layer.

41. The letter was sent after Marzorati had consulted with a representative of Great West, who informed her that he did not believe that the Bianchi claim was likely to exceed Great West's $5 million primary insurance layer.

42. AISLIC had guidelines for reviewing claims tendered to it as an excess insurer in order to determine if a claim should be monitored, and Marzorati, who reviewed the tender letter, had a supervisor to whom she reported and with whom she reviewed the tender letter and the response.

43. Alley, Gordon Trucking's outside counsel for the Bianchi action, was confused as to whom he should report to among Gordon Trucking's excess insurers.  He asked Pruett for clarification in an email.  When she did not respond, he did not seek further clarification.  Thereafter, Alley received from Gordon Trucking a copy of the August 22, 2008 AISLIC letter, and sought and received permission from Gordon Trucking to contact AISLIC.

44. On September 19, 2008, Alley sent an email to Marzorati confirming receipt of her August 22, 2008 letter.  In his email, Alley suggested that Marzorati leave the file open until she reviewed further information that he would be forwarding.

45. On October 2, 2008, after she received more information from Alley, Marzorati recommended that Bianchi's claim be forwarded to the complex unit for further investigation and handling.

8

46.     If Marzorati had not received the additional information from Gordon Trucking's outside counsel, the AISLIC claim file would have remained closed.

47.     Gordon Trucking's outside counsel did not provide to Columbia the information that it provided to AISLIC in September-October 2008 until after the verdict.

48.     Until shortly after the jury verdict in the Bianchi action in September 2009, AISLIC's claims representatives mistakenly were unaware of the Columbia policy and erroneously believed instead that AISLIC's layer of coverage was immediately above the $5 million Great West policy, which was the primary policy.

49.     Great West provided a defense to Gordon Trucking in connection with the Bianchi action, with Alley initially serving as Gordon Trucking's outside trial counsel.

50.     In June 2009, prior to trial, AISLIC retained additional counsel to supplement Gordon Trucking's defense counsel.  In particular, AISLIC retained Guy Calladine ("Calladine"), an experienced trial lawyer, to serve as part of the trial counsel team. AISLIC further retained the firm of Horvitz & Levy to assist trial counsel in developing trial strategies, assist with trial-related motions, jury instructions and verdict form, assist trial counsel in preserving the record for appeal if necessary, and to evaluate potential appellate issues.

51.     Prior to the resolution of the Bianchi action, Gordon Trucking's counsel attended several settlement conferences and mediations with Bianchi's counsel, and those counsel also had private settlement communications.  Prior to the High/Low settlement agreement that the parties entered into on September 18, 2009, Bianchi's settlement demand had been as high as $100 million.

52.     At a settlement conference that was held in early July 2009, the settlement judge asked Gordon Trucking to contribute $20 million to settle the Bianchi action and indicated that he felt that Gordon Trucking should offer "somewhere in the teens" to Bianchi.

53.     In June and July 2009, Salazar and the State of California settled with Bianchi.  Salazar settled for $2 million, which it claimed was the extent of its liability insurance, and the

Case No.: 09-CV-05441-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

State of California settled for $10 million.  Both settlements were approved, over the objection of Gordon Trucking, as having been made in good faith pursuant to California Code of Civil Procedure sections 877 and 877.6.  Gordon Trucking unsuccessfully petitioned the Court of Appeal for writs from both "good faith" orders.

54.   Trial in the Bianchi action against Gordon Trucking, Demma and Bimbela began on or about August 18, 2009.  At trial, Bianchi introduced evidence that Demma had been using his cell phone, in violation of Gordon Trucking's policy, at the time of the accident.  Bianchi also introduced into evidence a Gordon Trucking newsletter that discussed a Utah study equating driving while using a cell phone with drunk driving.

55.   Evidence at trial involved conflicting theories of accident reconstruction.  Based on the verdict, it appears the jury was persuaded by Bianchi's theory that Demma, the Gordon Trucking driver, failed to avoid the accident either because he was distracted as a result of using his cell phone and/or because he was following the vehicle in front of him too closely.  Bianchi also argued, apparently successfully, that the collision with the Gordon Trucking vehicle caused the Salazar truck to lose control such that it struck the vehicle in which Bianchi was a passenger.

56.   Evidence was also introduced at trial that the highway on which the accident occurred had the nickname "Blood Alley" and "Widowmaker," was a dangerous road where vehicles often crossed the center line, and was known generally to be a dangerous road.

57.   There were several instructions given to the jury in the Bianchi action that dealt with ordinary negligence and the standard of care for ordinary negligence (CACI 400, 401 and 700).  Over the objection of Gordon Trucking, the jury was also instructed that if Gordon Trucking was found to be a common carrier, then Gordon Trucking also owed the duty of a common carrier.  The parties here are in agreement that the common carrier instruction was erroneous and should not have been given.  The parties do dispute, however, whether the common carrier instruction was prejudicial.

Case No.: 09-CV-05441-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

58. The verdict form asked whether Demma had been negligent and, if so, whether his negligence was a substantial factor in causing harm to Bianchi. The verdict form did not ask whether Demma had been reckless. Nor was the jury asked whether Demma or Gordon Trucking violated the standard of care applicable to a common carrier.

59. As the trial neared conclusion, Gordon Trucking and Bianchi began negotiating a "High/Low" agreement. The parties reached agreement (the "High/Low Agreement") after deliberations had begun but before issuance of a verdict. The High/Low Agreement was memorialized in open court on September 18, 2009, prior to the jury verdict in the Bianchi action.

60. Members of the Gordon Trucking defense team, including AISLIC representatives, had explored other possible brackets for the High/Low agreement. The primary insurer, Great West, was asked if it would approve a $10 million/$2 million high/low if Bianchi came down from the $24 million/$4 million high/low that Bianchi's counsel had offered. Great West did not commit to that $10 million/$2 million high/low, and the parties here agree that Bianchi never offered it.

61. In its final form, the High/Low Agreement limited Gordon Trucking's exposure to $18 million, even if the actual verdict was higher, and guaranteed Bianchi a payment of $1 million, even if the verdict was for Gordon Trucking or specified an amount less than $1 million. In addition, the High/Low Agreement included a provision in which the parties to the Agreement agreed to waive their appellate rights.

62. On September 21, 2009, the jury returned a verdict of $49,123,375.97 in favor of Bianchi. The jury unanimously found that Demma was negligent and was a substantial factor in causing harm to Bianchi. The verdict allocated 35% of the fault to Gordon Trucking.

63. After accounting for settlement offsets, Gordon Trucking's fault, and California law regarding joint and several liability for economic damages, Gordon Trucking would

Case No.: 09-CV-05441-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
For the Northern District of California

have owed in excess of $31 million without the High/Low Agreement. With the agreement, Gordon Trucking owed Bianchi $18 million.

64. The verdict assessed damages against Gordon Trucking that were well in excess of the $10 million combined limits of insurance coverage provided by Great West ($5 million including the self-insured retention) and Columbia ($5 million first layer excess).

65. On September 24, 2009, Gordon Trucking notified Columbia of the verdict and the High/Low Agreement and stated that Columbia's payment portion of the verdict was $5 million.

66. At or about that time, Columbia requested and received a copy of the verdict, the High/Low Agreement that had been put on the record in the Bianchi action, and pre-trial and post-trial reports concerning the Bianchi action prepared by Gordon Trucking's counsel.

67. Gordon Trucking subsequently requested that Columbia pay its $5 million limits, but Columbia refused to pay any amount, citing the "no voluntary payment" provision of the Columbia policy (the "NVP provision"), which states: "With respect to any claim or suit to which this insurance applies, no insured will, except at the insured's own cost, make any payment, assume any obligation, or incur any expense other than for first aid, without our consent."

68. This refusal jeopardized the High/Low Agreement, because the $18 million was to be paid in installments, and unless the full $18 million was paid, there would have been a breach of the High/Low Agreement, and Gordon Trucking would have potentially been at risk for payment of the amount owing pursuant to the verdict.

69. Gordon Trucking and Great West paid the first installment of $5 million in December 2009.

70. The next installment of $5 million was due in January 2010. Because Columbia refused to pay that installment, Gordon Trucking requested that AISLIC do so. AISLIC paid the balance of the settlement amount of $13 million, which included $5 million that

Case No.: 09-CV-05441-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
For the Northern District of California

Gordon Trucking and AISLIC contended was due by Columbia.  That payment was made subject to a reservation of rights.

71.    AISLIC, pursuant to an agreement with Bianchi's counsel and Gordon Trucking, made a $10 million payment on February 5, 2010, consisting of the $5 million January installment that it contended Columbia owed and the $5 million installment that AISLIC was scheduled to make in February 2010.   AISLIC timely made the final $3 million payment on March 5, 2010.

72.    As a condition to AISLIC making the $5 million payment that AISLIC and Gordon Trucking contended was owed by Columbia, AISLIC received an assignment from Gordon Trucking of all Gordon Trucking's contractual rights under the Columbia policy.

73.    At the time AISLIC made its payments in connection with the High/Low agreement, including the payment it contended Columbia owed, Gordon Trucking had asserted claims against AISLIC, Columbia and Great West in this action.  Gordon Trucking alleged that AISLIC and Great West had an obligation to pay Columbia's policy limits if or to the extent that Columbia was relieved by the Court from paying any amount under the Columbia policy.  After the payments were made by AISLIC, Gordon Trucking dismissed its claims against AISLIC and Great West with prejudice.

74.    Following the payment of the $18 million pursuant to the High/Low agreement, Bianchi dismissed the Bianchi action with prejudice as to Gordon Trucking and Demma.

75.    One of Horvitz & Levy's duties in the Bianchi action was to prepare daily trial reports providing detailed summaries of the trial proceedings in the Bianchi action, including witness testimony, and providing impressions of witnesses, evidence, and court rulings and an identification of potential appellate issues.

76.    On September 17, 2009, at 6:26 a.m., prior to the High/Low Agreement being reached, AISLIC emailed Karen Bray ("Bray"), a partner at Horvitz & Levy, asking her to provide it with an evaluation of the top three to five appellate issues from the trial of the

13

United States District Court
For the Northern District of California

Bianchi action, including an explanation of the error, the proper relief on appeal, and a truthful representation of the likelihood of success of each argument by percentage.

77. Bray was the point person at Horvitz & Levy for the Bianchi action, had attended portions of the trial and written some daily trial reports, and coordinated the attendance by other Horvitz & Levy attorneys at the trial and the preparation by them of daily trial reports. Bray was familiar with the daily trial reports that she and other attorneys in her firm had prepared.

78. That same day, at 8:00 a.m., Horvitz & Levy provided that evaluation by email, concluding that the likelihood of success on appeal from jury instructions regarding negligence per se for either following too closely or reckless driving (CACI 418) had a low chance of success, i.e. maybe 15%. Horvitz & Levy also concluded that the likelihood of success on appeal from a jury instruction about the standard of care for a common carrier (CACI 902) had perhaps a 25% chance of success. The possible relief on appeal with respect to each of those instructions was a new trial, and not a judgment in favor of Gordon Trucking.

79. While Gordon Trucking and AISLIC were considering whether to enter into the High/Low Agreement, Jason Litt ("Litt"), a Horvitz & Levy partner who had attended portions of the trial, including the closing arguments, and who had reviewed the daily trial reports prepared by himself and other lawyers in his firm, had a conversation with AISLIC's claims representative, Brent Roberts ("Roberts"), who had attended most of the trial. That conversation may have also included Pruett and Ed Dildine, Great West's claims representative who attended most of the trial.

80. During that conversation, Litt advised that it was extremely unlikely that Gordon Trucking would obtain a defense verdict, that there was a significant likelihood that the jury would award more than $18 million, and that it was not likely that Gordon Trucking would prevail on appeal or do substantially better if the case was re-tried.

Case No.: 09-CV-05441-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

81.   In his daily trial reports, Litt described the "common carrier" jury instruction as creating a 'good appellate issue." Litt and Bray explained at trial that a "good appellate issue" means that it is a viable, articulable argument that can be supported with legal authority, and that anything with more than a 20% chance of success on appeal is considered a "good appellate issue."

82.   Bray's evaluation of appellate issues was made prior to the closing arguments in the Bianchi trial. Litt reviewed Bray's evaluations and attended the closing argument. As a result of the closing, Litt might have slightly adjusted the likelihood of success on appeal of the "common carrier" instruction issue and probably would have put the percentage chance of success at 25-30%.

83.   Bray, upon reading Litt's daily trial reports of the closing arguments, also concluded that the closing arguments did not have a substantial impact on her evaluation of the likelihood of success on appeal of the "common carrier" instruction issue.

**B. Testimony at Trial**

84.   Columbia's witnesses at trial were Guy Calladine (video deposition), a trial lawyer in the Bianchi action representing AISLIC (*see* Tr., Vol. 1 at 108), and Edith Matthai, an expert witness on the issues of Columbia's claims handling procedures and chances of success on appeal of the allegedly erroneous jury instructions given in the Bianchi Action. *See* Tr., Vol. 2 at 114-196).

85.   Gordon Trucking and AISLIC's witnesses at trial were James Hoefer, Jerome Falk, and Edward McKinnon. As noted above, Hoefer testified with respect to his general method for reviewing claims and with respect to the specific manner in which he reviewed the tender letter in the Bianchi Action. *See* Tr., Vol. 1 at 51-106. Falk, an expert witness, testified on the chances of success on appeal of the allegedly erroneous jury instructions given in the Bianchi Action. *See* Tr., Vol. 3 at 209-260. McKinnon, also an expert witness, testified regarding the reasonableness of Columbia's claims handling procedures. *See* Tr., Vol. 3 at 261-326.

15

86.   The parties also submitted deposition excerpts, and counter-designation excerpts. Columbia designated the deposition testimony of: Edward Dildine; Jenna Marzorati; Michael Muscarella; Theresa Pruett; Pamela Reed; and Holly Weatherby.  *See* Dkt. # 100.  Gordon Trucking and AISLIC designated the deposition testimony of: Richard Alley; Karen Bray; Guy Calladine; Edward Dildine; Steve Gordon; Jason Litt; Jenna Marzorati; Michael Muscarella; Theresa Pruett; Pamela Reed; Richard Roberts; and. Holly Weatherby.  *See* Dkt. # 99.

## II.  CONCLUSIONS OF LAW

The central legal dispute at trial was whether Columbia is relieved from its obligations under its policy with its insured Gordon Trucking because, pursuant to a "no voluntary payments provision" in the policy, Columbia Casualty was "actually and substantially prejudiced" by its lack of participation in the Bianchi litigation and settlement.  A secondary issue is whether Columbia breached its duty to investigate the Bianchi claim.

**A.  Columbia did not meet its burden of establishing actual and substantial prejudice**.

1.   In an Order dated December 23, 2010, the Court held that Washington law applies to this matter, and that, under Washington law, Columbia has the burden to establish actual and substantial prejudice before it can enforce the NVP provision.  *See Columbia Cas. Co. v. Gordon Trucking, Inc.,* 758 F. Supp. 2d 909, 923 (N. D. Cal. 2010).

2.   Washington law also governs Columbia's duty to investigate the Bianchi claim; whether Columbia breached that duty; and, if so, whether that breach was in bad faith. *Columbia Cas. Co.,* 758 F. Supp. 2d at 923 and n. 7.

3.    In its Pretrial Order of June 8, 2011, the Court ruled that the "standard for actual prejudice at trial will be whether Plaintiff Columbia Casualty suffered an identifiable and material detrimental effect on its ability to defend its interests from not participating in the underlying Bianchi litigation and settlement."

4.   The standard for actual prejudice comes from the Washington Supreme Court's decision in *Mut. of Enumclaw Ins. Co. v. USF Ins. Co.*, 191 P.3d 866 (Wash. 2008).

United States District Court
For the Northern District of California

Under *Mutual of Enumclaw*, "in order to show prejudice, the insurer must prove that an insured's breach of a notice provision had an identifiable and material detrimental effect on its ability to defend its interests.  The rule will manifest itself differently depending on the kind of prejudice an insurer claims.  If the insurer claims that its own counsel would have defended differently, it must show that its participation would have materially affected the outcome, either as to liability or the amount of damages.  If the insurer claims that it was deprived of the ability to investigate, it must show that the kind of evidence that was lost would have been material to its defense.  This rule effectuates the longstanding *Salzberg* rule that the insurer has the burden of proving actual and substantial prejudice."  *Id*. at 878.

5.   With this policy in mind, Washington courts reason that "[t]o release an insurer from its obligations without a showing of actual prejudice would be to authorize a possible windfall for the insurers."  *Public Util. Dist. No. 1*, 881 P.2d at 1029. (citing *Salzberg*, 85 Wash. 2d at 377, 535 P.2d 816).  Thus, Washington courts hold that "an insurer cannot deprive an insured of the benefit of purchased coverage absent a showing that the insurer was actually prejudiced by the insured's noncompliance."  *Id*.;  *see also Axis Surplus Ins. Co. v. James River Ins. Co.*, 635 F. Supp. 2d 1214, 1218-19 (W.D. Wash. 2009) ("[C]ourts have repeatedly held that an insured's breach of the duty . . . to refrain from voluntary payments . . . is no basis for denying coverage, unless the insurer can prove actual and substantial prejudice arising from the breach.  This basic principle of Washington insurance law should come as no surprise . . . .").

6.   At trial, Columbia argued that it was actually and substantially prejudiced by not participating in the Bianchi action, or in Columbia's words, actually prejudiced from being "excluded" from the Bianchi action.

7.   Preliminarily, the Court notes that there is no dispute Gordon Trucking notified Columbia of the Bianchi action by tendering a claim on August 5, 2008, nearly a year before the trial in the Bianchi action.  *See* Undisputed Fact No. 13 ("On August 5, 2008,

17

Gordon Trucking tendered the claim asserted by Bianchi in the Bianchi action to Columbia, AISLIC and Fireman's Fund (the "tender letter"). Moreover, there is no dispute that Columbia received the claim, and responded via the Hoefer letter. *See* Undisputed Fact No. 28 (concluding that Gordon Trucking's claim was "Record Only."). Thus, Columbia's position that it was "excluded" from the Bianchi action is not credible. As Columbia's expert, Edith Matthai, testified at trial, Columbia could have chosen to monitor the lawsuit. *See* Tr., Vol. 2 at 158.

8. Columbia has failed to make the required showing that a breach of the NVP provision had an identifiable and material detrimental effect on its ability to defend its interests. At most, Columbia Casualty has established that it lost *an opportunity to participate*, but it has not established an "identifiable and material detrimental effect on its ability to defend its interests." *Mutual of Enumclaw*, 191 P.3d at 878.

9. First, Columbia did have actual notice of Gordon Trucking's August 5, 2008 tender letter, which Hoefer filed as "Record Only" without much investigation. Hoefer testified at trial that he spent "approximately a half hour" to review the August 5, 2008 tender letter and claim materials. Tr., Vol. 1 at 59. Hoefer also testified that he did not believe "any additional information was warranted," and that Gordon Trucking could have provided additional information, "especially in terms of damages," which may have led to a decision to "undesignate" the claim as "record only." Tr. Vol. 1 at 61. Thus, despite the opportunity to do so, Columbia chose not to participate or conduct further investigation into the Bianchi claim. Columbia's decision to place the burden to provide additional information on its insured, Gordon Trucking, does not establish an identifiable and material detriment to Columbia. Moreover, there is no dispute that, at the time Hoefer sent the response letter, Bianchi's injuries, whether described as "catastrophic" or "severe," were of the utmost seriousness. *See* Undisputed Fact No. 32 ("Hoefer would not have designated the claim as 'Record Only' if he had information that Bianchi was on life support.") and Undisputed Fact No. 33 ("Medical records in

18

Case No.: 09-CV-05441-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

existence prior to Hoefer sending the Columbia response letter on August 14, 2008, revealed that Bianchi had suffered catastrophic injuries during the accident, and that following the accident Bianchi had 'no significant neurologic response other than occasional gasping respiratory movements.'"); *see also* Exh. 19, August 5, 2008 Letter and CHP Report at 1247 (explaining that a large truck hit the car in which Bianchi was a passenger, and that "there was a significant amount of intrusion to the left rear passenger compartment" where Bianchi was seated).  There is also no dispute that, at the time he sent the response letter, Hoefer was aware of California law regarding joint and several liability.  *See* Undisputed Fact No. 34 ("Hoefer was aware when he sent the Columbia response letter that under California law, Gordon Trucking would be jointly and severally liable for all of Bianchi's economic damages even if Gordon Trucking was found only 1% at fault.  When he sent the Columbia response letter, Hoefer believed that there was a 5-10% chance that Gordon Trucking could be found liable.").

10.  Second, the defendants in the Bianchi action litigated the case vigorously, with AISLIC bringing in additional trial counsel (Calladine) and shadow counsel (Horvitz & Levy).  Defendants only agreed to the High/Low Settlement after the trial appeared to be going downhill.  There is no question of a "collusive settlement" between plaintiff Bianchi and defendants.  *Compare Griffin v. Allstate Ins. Co.*, 29 P.3d 777, 783 (Wash. Ct. App. 2001) ("The purpose of a voluntary payment provision is to 'obviate the risk of a covinous or collusive combination between the assured and the injured third party and to restrain the assured from voluntary action materially prejudicial to the insurers contractual rights.'").  The High/Low Agreement limited Gordon Trucking's exposure to $18 million.  *See* Undisputed Fact No. 61.  The jury unanimously found that Demma was negligent and was a substantial factor in causing harm to Bianchi.  The verdict allocated 35% of the fault to Gordon Trucking.  With a $49,123, 375.97 jury verdict in favor of Bianchi, Gordon Trucking would have owed in excess of $31 million without the High/Low Agreement.  With the agreement, Gordon Trucking owed Bianchi $18

19

Case No.: 09-CV-05441-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

million.  *See* Undisputed Facts No. 62-63.  The verdict assessed damages against Gordon Trucking that were well in excess of the $10 million combined limits of insurance coverage provided by Great West ($5 million including the self-insured retention) and Columbia ($5 million first layer excess).  *See* Undisputed Fact No. 64.  Thus, the High/Low Agreement clearly limited Gordon Trucking's exposure.

11.   Columbia has submitted no credible evidence that it would have acted any differently than the defendants in the Bianchi action.  Columbia has admitted that it does not know what it would have done, or done differently, in the Bianchi action if it had been involved in that action.  Columbia has pointed to no evidence suggesting that additional evidence should have presented but was not presented.  *See Mutual of Enumclaw*, 191 P.3d at 878 ("If the insurer claims that it was deprived of the ability to investigate, it must show that the kind of evidence that was lost would have been material to its defense.").  For example, both in her deposition and at trial, Columbia's expert witness, Edith Matthai, testified that she did not know what Columbia would have or could have done differently.  *See, e.g.*, Tr., Vol. 2 at 150 ("Q: Do you know what Columbia would have done differently if had actually participated in the Bianchi trial from August 2008 through the end of trial?  A: No.").  This admission is fatal to Columbia's burden of establishing that its participation in the case would have materially affected the outcome of the case either as to liability or damages.

12.   Third, Columbia has also admitted that it does not know if it would have reached a different conclusion about making the High/Low agreement with a waiver of appellate rights had it actually participated in the trial and evaluated the settlement opportunities.

13.   Columbia argued at trial that it is possible that it would not have agreed to waive its appellate rights because of an allegedly erroneous jury instruction.  Over the objection of Gordon Trucking, the jury in the Bianchi action was instructed that if Gordon Trucking was found to be a common carrier, then Gordon Trucking also owed the duty of a common carrier.  The parties here are in agreement that the common carrier

20

instruction was erroneous and should not have been given. The parties do dispute, however, whether the common carrier instruction was prejudicial.

14.   Columbia has not met its burden of establishing that the common carrier instruction was actually and substantially prejudicial. There is no dispute that the jury in the Bianchi action was given several jury instructions regarding ordinary negligence, and that the jury verdict form did not ask whether Demma had been reckless or violated the standard of care for a common carrier. *See* Undisputed Fact No. 57. Moreover, there was overwhelming evidence of negligence in the Bianchi action. *See* Undisputed Facts No. 54-56 (detailing evidence at trial that Demma had been using his cell phone, in violation of Gordon Trucking's policy, at the time of the accident; evidence a Gordon Trucking newsletter that discussed a Utah study equating driving while using a cell phone with drunk driving; evidence that it appears the jury was persuaded by Bianchi's theory that Demma, the Gordon Trucking driver, failed to avoid the accident either because he was distracted as a result of using his cell phone and/or because he was following the vehicle in front of him too closely; evidence that the collision with the Gordon Trucking vehicle caused the Salazar truck to lose control such that it struck the vehicle in which Bianchi was a passenger; and evidence at trial that the highway on which the accident occurred had the nickname "Blood Alley" and "Widowmaker," was a dangerous road where vehicles often crossed the center line, and was known generally to be a dangerous road.).

15.   The Horvitz & Levy attorneys following the Bianchi action for any appellate issue, estimated that, at best, the chances of a successful appeal on the common carrier instruction was "perhaps 25%." *See* Undisputed Fact No. 78. In light of the overwhelming evidence of negligence set forth above, Columbia has not established that an appeal would have been successful. Counsel for defendants in the Bianchi action agreed that it was extremely unlikely that Gordon Trucking would obtain a defense verdict, that there was a significant likelihood that the jury would award more

21

United States District Court
For the Northern District of California

than $18 million, and that it was not likely that Gordon Trucking would prevail on

appeal or do substantially better if the case was re-tried.  *See* Undisputed Fact No. 80.

Columbia has submitted no credible evidence that it, unlike any other defendant in the

Bianchi action, would have rejected the High/Low Agreement and forced an appeal,

risking responsibility the entire payment amount ($49,123, 375.97) of the jury verdict.

16.   And fourth, Columbia has failed to establish that it could have settled the Bianchi action

for less than $10 million before trial.  Gordon Trucking's primary coverage was a $5

million policy with Great West that included a $500,000 self-insured retention by

Gordon Trucking.  Columbia, a CNA company, issued an excess $5 million policy, and,

as the first excess layer of insurance above the Great West policy.  Prior to the

resolution of the Bianchi action, Gordon Trucking's counsel attended several settlement

conferences and mediations with Bianchi's counsel, and those counsel also had private

settlement communications.  Prior to the High/Low settlement agreement that the

parties entered into on September 18, 2009, Bianchi's settlement demand had been as

high as $100 million.  *See* Undisputed Fact No. 51.  At a settlement conference that

was held in early July 2009, months in advance of the jury trial, the settlement judge

asked Gordon Trucking to contribute $20 million to settle the Bianchi action and

indicated that he felt that Gordon Trucking should offer "somewhere in the teens" to

Bianchi.  *See* Undisputed Fact No. 52.  Columbia has submitted no credible evidence

that counsel for Bianchi ever offered or even considered any High/Low agreement with

a high of less than $10 million.  In light of Gordon Trucking's responsibility for $31

million of the $49,123, 375.97 jury award in the Bianchi action, the court-approved $18

million/$1 million High/Low Agreement can only be described as reasonable and non-

collusive.  *See Mutual of Enumclaw*, 191 P.3d at 877 (noting that the circumstances

surrounding a settlement, including any indication of fraud or collusion, are important

factors in evaluating prejudice, and that court-approved settlements and trials on

22

United States District Court
For the Northern District of California

damages are much more reliable factors that a non-participating insurer was not prejudiced).

17.   In conclusion, Columbia has not satisfied its burden of establishing that it was actually and substantially prejudiced by its lack of participation in the Bianchi action. Accordingly, Columbia may not rely on the NVP provision to avoid payment of its $5 million contribution to the $18 million settlement in the Bianchi action. Columbia is obligated to pay its $5 million policy limits in connection with the satisfaction of the High/Low Agreement.

**B. Columbia did not act in bad faith in its initial handling of the Bianchi claim.**

18.   The central dispute at trial was whether Columbia was actually or substantially prejudiced by its lack of participation in the Bianchi action. A secondary issue involves whether Columbia, via the August 14, 2008 Hoefer response letter, acted in bad faith by marking Gordon Trucking's tender letter "record only" without sufficient investigation.

19.   "In order to establish bad faith, an insured is required to show the breach was unreasonable, frivolous, or unfounded. Whether an insurer acted in bad faith is a question of fact.").  *See St. Paul Fire and Marine Ins. Co. v. Onvia, Inc.*, 196 P.3d 664, 668 (Wash. 2008).  ).  "The duty to act in good faith includes the duty to reasonably investigate a claim."  *Aecon Bldgs., Inc. v. Zurich North America*, 572 F. Supp. 2d 1227, 1235 (W.D. Wash. 2008).

20.   AISLIC accurately points out that Columbia's representative, Hoefer, conducted little investigation after receiving Gordon Trucking's tender letter and that Hoefer never contacted Great West, Gordon Trucking, or Gordon Trucking's outside counsel prior to marking the claim as "record only."

21.   The duty to reasonably investigate a claim appears to have two component duties. One of these duties requires an insurer to "act with reasonable promptness in investigation and communication with their insureds following notice of a claim and tender of defense." *St. Paul Fire*, 196 P.3d at 669.  Columbia's response to Gordon Trucking's notice of loss

23

letter was prompt.  In just over a week, Columbia responded to Gordon Trucking's letter.  The response letter informed Gordon Trucking that Columbia was designating the matter as record only and requested that Gordon Trucking share with Columbia any future information indicating that Columbia's policy may be impacted.  Given that Columbia was not the primary insurer, that Gordon Trucking already had representation through Great West, and that Gordon Trucking's letter promised further information, this response to Gordon Trucking's initial communication does not evince bad faith.

22.   This finding is supported by the fact that AISLIC's initial response to the notice of loss letter was similar to Columbia's.  In AISLIC's initial response, it informed Gordon Trucking that it was closing its file on the matter and that, in its opinion, the claim would not impact AISLIC's coverage.  *See* Undisputed Fact No. 39 ("On August 22, 2008, Jenna Marzorati ("Marzorati") of AISLIC sent a letter to Gordon Trucking in response to the tender letter, stating that it was AISLIC's opinion that the Bianchi claim did not present an exposure to the AISLIC policy and notifying Gordon Trucking that AISLIC was closing its file.  AISLIC's letter further stated that if Gordon Trucking became aware of a change in status in one or more of certain areas, then Gordon Trucking should immediately notify AISLIC so that it could reconsider the need to actively monitor further developments.).  It was not until AISLIC received further information from Alley, Great West's adjustor, that it changed its position on the matter and began actively monitoring the Bianchi action.  Moreover, Great West itself also initially believed that the Bianchi claim would not impact any of the excess insurers.  Finally, even AISLIC's own expert, Edward McKinnon, acknowledged that AISLIC's handling of the claim, which was essentially identical to Columbia's initial handling of the claim, was proper in light of the circumstances.  *See* Tr., Vol. 3 at 322.

23.   AISLIC also contends that Columbia acted in bad faith by failing to investigate before denying coverage.  However, in *Aecon*, the court noted that it was "the insurer's

24

United States District Court
For the Northern District of California

affirmative duty to investigate a claim before it denies coverage." *Aecon Bldgs., Inc. v. Zurich North America, supra*, 572 F. Supp. 2d at 1237.

24.   Here, Columbia's August 14, 2009 response letter to Gordon Trucking's notice of tender did not constitute a denial of coverage. Rather, it was a notification that Columbia did not anticipate its policy limits would be affected by the Bianchi matter and a request for additional information if circumstances changed. Columbia did not deny coverage until after it was notified of the jury verdict in September 2009. Before this denial, Columbia requested and received a pre-trial report, a post trial report, and other existing reports. It was not until Columbia analyzed and considered these reports, along with the language of the policy it issued to Gordon Trucking, that Columbia denied Gordon Trucking's coverage based on the NVP provision. The Court, after summary judgment and a bench trial, has determined that Columbia may not rely on the NVP provision because it has not satisfied its burden of establishing actual and substantial prejudice. Gordon Trucking, however, has not established that Columbia's denial based on the NVP provision was "unreasonable, frivolous, or unfounded." *See St. Paul*, 196 P.3d at 668.

25.   In conclusion, Columbia's denial of coverage and institution of a declaratory relief action is not "unreasonable, frivolous, or unfounded," and is thus not an action in bad faith.

## III.   CONCLUSION

For the reasons set forth above, Columbia does not prevail in its declaratory action and Defendants do not prevail in their bad faith action. Accordingly, Columbia is obligated to pay its $5 million policy limits. Columbia seeks prejudgment interest of 10% and reasonable costs and attorney's fees. The parties agreed that prejudgment interest, costs, and attorney's fees would depend on the outcome of the bench trial, and would be determined in post-trial proceedings. Accordingly, within 30 days of this Order, Defendants shall file a motion for award of prejudgment interest, costs, and attorney's fees, and shall notice the motion for a hearing only after contacting the

Case No.: 09-CV-05441-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

undersigned's Courtroom Deputy.  The opposition and reply, if any, shall be filed in accordance with the District's Civil Local Rules.

**IT IS SO ORDERED.**

Dated: September 23, 2011

LUCY H. KOH
United States District Judge

Case No.: 09-CV-05441-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW